The next case today is Securities and Exchange Commission v. Jonathan Morrone, AP19-2006 and Securities and Exchange Commission v. Z. Paul Gerberg, AP19-2007. Attorney Kaplan, please introduce yourself for the record and proceed with your argument. Thank you. May it please the Court, my name is Stephen Kaplan. I represent the appellants, Jonathan Morrone and Z. Paul Gerberg. It's a pleasure to be before the Court this morning. Your Honors, we are appealing from what we believe to be an improvident granting of summary judgment against these two defendants who are essentially minor players in this alleged scheme. Before we even get to the factual issues which we think exist as to each of the claims which should have precluded summary judgment, there's an overriding issue as to whether or not as to these overseas sales, which is the overwhelming amount of the claim that was before the Court, whether as to these overseas sales of securities, the Court properly exercised jurisdiction. This is an issue which really hasn't been addressed by the First Circuit but has been addressed extensively, first by the United States Supreme Court and then recently extensively by the Second Circuit. In the Morrison case, the Supreme Court decision, the Court said before a district court could exercise jurisdiction over transactions which have a foreign element, the Court has to find either one of two things, either that it is a transaction involving a security traded on a domestic exchange, this was not, so it doesn't fall within that Morrison's criteria, or whether it can be deemed to be a domestic transaction. That raises the first issue before the Court, were these domestic transactions? The Courts have predominantly, and the Court below, applied the standard of did irrevocable liability occur for the sale of these securities in the United States? The Court said the subscription agreements that the purchasers signed in Europe were sent to the United States and irrevocable liability occurred only when those subscription agreements were countersigned in the United States by a representative of a biodefense company. Why isn't that an accurate counsel? Because it's only when the, I guess it was the president of the company, signed the document that the stock was then issued to the foreign investors, so why, it really required that step for the deal to become, if you would be, one could say irrevocable, the stock did not issue until that happened. Yes and no, Judge, and I think that this is why there is an issue of fact. The SEC makes a big deal about this letter that Jonathan Marone sent out, this is really his big involvement, he sends out this letter to the investors. The letter that Marone sends to the investors says, I'll read it, upon receipt of payment for the shares, I will mail you by overnight express your share certificate. The SEC takes the position that Mr. Marone was an executive of the company and had authority on behalf of the company. This letter is an offer, I'm sending you, if you send us the money, if you send it back to us, we will send you back the shares, it doesn't qualify it and say upon someone countersigning the subscription agreement, it doesn't qualify at all. At a minimum, I think it raises an issue of fact as to whether or not at that point. He facilitated the signing of the stock issuance and then manually facilitated the delivery of the stock. That's all true, Judge, but I think based on his letter to the investors. It was not just the letter combined, but what he actually did. I understood, Judge, but I think it at least raises an issue of fact as to whether or not Biodefense was contractually obligated at the point where they mailed off that letter and said, all you need to do is sign the subscription and send the money, where the Biodefense was  Counsel, I'm back with Judge López on the opening point. What does it matter if your client's letter to investors did not mention the further steps? It was a sales letter. It was meant to reassure them that the further steps would be taken. I don't understand why the legal issue would turn on the adequacy of your client's representations. Your Honor, I think what it does is raises the issue. This was something, if you look at the Kavala Bay decision, which is the Second Circuit's decision from a couple of months ago, one of the principal issues and the reason why the court in Kavala Bay went to the second step, the Park Central analysis, was because they said there's an issue of fact as to when the execution of a subscription agreement constitutes irrevocable liability. I think what the mistake here was to simply assume that... I'm sorry, but that's hardly responsive. You keep insisting there's an issue of fact. I frankly don't see it because under-inclusiveness by your client in representations does not create an issue of fact. But regardless, as a matter of law, the liability was at the point it was signed, which was I respectfully believe, Your Honor, that there's an issue of fact there, but let me move on because the second point is even if you find that there was irrevocable liability, that's where the district court stopped its analysis. But if you go to the Second Circuit's Kavala Bay decision and to the Park Central decision, which I think are fairly persuasive and I urge the court to adopt, Kavala Bay makes the point that the Morrison standard is a threshold standard, but not a competitive standard. Once you pass, once you say you can have jurisdiction, then you have to go to the analysis as to whether or not there should be jurisdiction, whether it is a predominantly domestic or foreign transaction. If you look at the facts of these transactions, 100% of the investors were offshore foreign investors. I believe Judge Thompson was beginning to point to this. There's a lot more evidence here than merely when a liability set in. Your clients in fact produced the marketing material. They supervised the guys who had the direct contacts with these agents, the four different agents in different countries. They prepared the materials that were being sent to potential investors. This seems to me to be a plus case. Not only is the test met, but plus there are a whole lot of other factors here. There are, Judge, but again, I keep harking back to the recent Kavala Bay decision. In that case, the solicitation was made directly from New York City. The issuing company, while it was a Bermudian company, was headquartered in New York. The solicitation was made from New York, no question about it. There were lots of direct contacts. The subscription agreements were signed in New York, but the court still found that the nature of the foreign element predominated. Here, yes, I can't dispute that there were some American elements here. Your Honor, is there any dispute about the proposition that Mr. Marone, working in the United States, was responsible for preparing the investment packet, which would then be used to induce people to invest. Most conspicuously, that investment packet said nothing, nothing at all about these extraordinary fees that would be taken by Agile and then supplemented by fees that would go to Mr. Marone, Mr. Gerber, and others. I mean, there's really no dispute about that. Isn't that correct? His responsibility for preparing the packets and the omission of that critical information. Yes. I mean, Your Honor, there is no dispute that there was no disclosure made of these extraordinary fees and that in the letter, Mr. Gerber, Mr. Marone was responsible for preparing that investment packet, which omitted that critical information. Isn't the record clear on that? It is, Judge, but I mean, the investment packet you're referring to is really the subscription agreement and Mr. Marone's cover letter. This is a packet that was sent to the investors after they had been solicited by the overseas entities and after they had agreed to purchase the stock, then they were sent this packet by Mr. Marone, which had a subscription agreement and which had his cover letter. And it's absolutely… But somehow, the packet was not material to the decision that the investors made? Is that what you're trying to argue? Well, I think you could say that the investor had already agreed to send their money. Now, admittedly, they had not sent their money until they received the material from Mr. Marone, but they had already spoken, they had already been solicited, they had already agreed, their names were sent to the company because they had agreed to purchase the shares, at which point they were sent this letter from Mr. Marone. I think, Your Honor, the securities laws really are not designed, they're designed to protect American investors and domestic investors. The laws of England can protect the English investors, the long laws of France can protect French investors. The reasoning behind Park Central and Cavalot Bay and their progeny is that the scope of the securities laws can theoretically encompass these claims, but the question is whether they should encompass these claims. You had a solicitation. Yes, Mr. Marone sent the letter after the fact. Well, he also got a commission. Excuse me, Your Honor, I didn't catch that. He also got a commission. Arguably, they got a commission. The company had no revenue, so obviously, anybody who was being paid out of this money. Counsel, you suggested that Marone's involvement was after the investments had been decided on by the customers, but the SEC says that Marone emailed Hamburger a document to send to Agili with talking points to make the sale, but the talking points carefully did not disclose the 75% fee to be taken by Agili or the commissions that would be taken out. Furthermore, I believe your description of the packet that was sent was under-inclusive. There was a letter from Marone signed by him, the stock subscription agreement, and instructions on how to send the payment in order to complete the purchase, correct? That is correct, Judge. I apologize if I omitted that, but it was not a substantive pitch letter, for example. It wasn't a prospectus. It wasn't an offering document. It was documents to enable the person to complete the sale they had already made. The SEC says your clients were advised by outside counsel in the U.S. and advised by Lord whatever his name was of the boiler room sales tactics being used, that it was inappropriate, that these disclosures had to be made, and yet your clients chose to do nothing about that. Now, it could be that this test does not include inaction in the face of obvious risks to investors. Is that the argument you're making? It's only actions and not inactions that can be considered? Well, I mean, so for example, Your Honor, Yes or no, please. Yes, I think that's right, because I don't think that the failure of Mr. Marone or Mr. Yerberg to make the disclosures would rise to the level of a 10b-5 or 17a violation. In fact, the court said that it couldn't find Mr. Yerberg that he was anything more than an administrative functionary and accordingly denied summary judgment on 17a and 10b. It said that there were some questions as to Marone, but found that he probably, if I'm thinking correctly, his conduct rose to the level of a violation of 17a and 10b, and I'm not going to have time to get into those, but I think, and I'll try to address them on my reserve time, but I think that if you look at the analysis under the 10b and 17a violations, they really didn't have an obligation. They weren't communicating with these folks. They were really functioning as administrative functionaries. They were not the decision makers. Certainly, Yerberg was not a decision maker, and the court found that, and I think arguably there are clear issues of fact whether or not Marone was a decision maker and should have been held responsible under 17a or 10b for any of the alleged failures to make disclosure. So the answer, Your Honor, is I think that the question you raised raises a specific issue of fact which was prematurely decided by the court below. Thank you, Your Honors, and I'll address the other issues on my rebuttal time. Yes, thank you. Thank you. Attorney Kaplan, please mute your device at this time. Attorney Wyman, if you could unmute your audio and video, and please introduce yourself on the record and proceed. Thank you. May it please the court, my name is Theodore Wyman, and I represent the Securities and Exchange Commission. As detailed in the commission's brief, there are multiple avenues by which this court can affirm the district court's judgment on every count, but many of the potential issues here need not be reached. Just a few undisputed facts satisfy the relevant standards for each statute for Morrison, and this can be resolved fairly easily on these facts. With respect to Morrison, I wanted to first point out that the purpose of the securities laws is not merely to protect American investors. I have to start with this because this is an important point. It's to protect the marketplace, it's to protect confidence in the American markets, it's to regulate American issuers, brokers operating in America. I mean, these acts were happening with an issuer, brokers operating in America, plans developed in America. So that is clearly within the ambit of the federal securities laws and what Congress intended to regulate. Not merely, there's no nationality requirement for the victims of a fraud anywhere in the statutes. With respect to the cover letter, which the opposing counsel is putting a lot of weight on, it talks about the timing, essentially. Send us the money and then we'll send the shares back. But I point the court to appendix 1644 and 46. That's the actual subscription agreement and the signature page that the investor signed. The signature page at the bottom, it says, accepted as of blank date and has a place for biodefense to sign. And paragraphs two and three of the subscription agreement say biodefense has the right to reject the agreement. Biodefense is bound when it executes the agreement and it reserves the right to send back the check that was mailed. Now, they didn't do that, of course, but they had the right. And the very fact that they went through with it, as was pointed out in the questions at the beginning of this argument, shows that that's why they went through with it. That's why they executed the agreement. That's why they executed the share certificates, which also said signed to indicate that's when they took effect. I think it's fairly clear that the execution of the agreement was when biodefense irrevocably bound itself to sell the shares. We're satisfied. Yeah, so could you explain to us the – because I think it's a point that opposing counsel is making that if, with respect to the applicability of some of the provisions at issue, there were genuine issues of material fact with respect to Mr. Gerberg, the same reasoning should apply to Mr. Moroney as well. Could you please explain to us why that isn't – why the – with respect to liability. Legitimately made a distinction in their culpability under the statute. What was different about the roles that they were playing so that there were genuine issues of fact with respect to Mr. Gerberg, not Mr. Moroney? I think it would be helpful to understand that. Right, well, I think the district court was extremely conservative with its analysis and really paid a lot of attention to distinctions, essentially, to reach a conclusion as to who it deemed more responsible. The court could have gone much further. The actions of Gerberg – and, of course, this court's reviews did not affirm on any ground in the record. It's not bound by the district court's reasoning. Counsel, you didn't appeal as to Gerberg, so why don't you take the premise of Judge Lopez's question as a given and then explain the difference between Moroney and Gerberg and why there are no issues of fact as to Moroney, okay? Absolutely, Your Honor. Absolutely. Thank you, Your Honor. Essentially, Moroney had greater involvement on the undisputed facts in developing the documents that were used. He participated in developing the cover letter that was signed by him that was sent to the investors. He participated in drafts that were sent back and forth of the subscription agreement itself. He provided the payment instructions, and he provided talking points to the callers as well. So he certainly had greater involvement on the undisputed facts than Gerberg. At Lorenzo v. SEC, essentially, the dissemination of misrepresentations and documents constitutes securities fraud, and that occurred here when they sent the investor packets containing the documents to the investors that they knew did not disclose these exorbitant conditions that they also knew would consume virtually all of the funds that investors invested with them. That alone is enough, and it certainly satisfies, for Gerberg, Section 17A.3. We believe it also satisfies the other provisions, but again, we didn't appeal that. It's just that, essentially, the law – there's so many undisputed facts supporting their liability that there's no – I wouldn't say there's an extinction. Mr. Gerberg, apparently, the record indicates that he was responsible for the script that was used at the call centers, and that was sufficient to support his liability under certain of the provisions here, but not others. Is that correct? That was critical to the determinations of liability for him. Is that correct? Preparing that script, is that right? The script was one of many facts, and the script alone would support all of the findings. I mean, he helped put the words in the mouth of the solicitors that he hired, but there's many other facts in the record as well. I wouldn't say it turns on that. I mean, both Marone and Gerberg were in the meetings. With CEO Michael Lew, the screen was pitched to them. They conferred on it. That's confirmed in testimony. The three of them met with outside counsel who urged them, don't proceed with this. The commissions are illegitimate. Those were the three in the meetings, and then Marone and Gerberg supplied the documents, the call script, the talking points, and then they actually conducted each transaction. The opposing counsel point – argues that investors abroad essentially bought over the phone, and that's simply not true. They expressed interest, and then their names were forwarded to Marone and Gerberg, and one of those two then sent an email to the investor, then sent the documents, the marketing materials, the subscription agreement, and that was the communication that actually undertook the sale, which they then shepherded from beginning to end, culminating in sending the certificates. So certainly providing the call script was one important aspect of it, but there's so many facts here that support Gerberg's liability and Marone's liability that that alone is, you know, it's supplemented by a lot of other evidence. With respect to Covello Bay, which also came up in the opening argument, you know, in our brief we discuss how the Ninth Circuit has rejected that, what the Second Circuit calls a gloss on Morrison, and there's reasons there, and we believe that this court should also decline to adopt that gloss. Morrison is very clear that there's a bright line test where the purchase or sale took place. But even if Covello Bay applied, or if it were to be assumed and then Covello Bay applied here, there's a number of important factual distinctions that distinguish this case from both Covello Bay and the Park Central Second Circuit case that first developed this standard that looks to whether a case is predominantly foreign. In both of those cases, the security was an interest in a foreign corporation. Here, it's an American corporation. That's what the issue is. In both of those cases, the corporate defendant was a foreign company. Here, it was an American company, a Delaware company that was operating in Boston. Also important in Covello Bay was that there were sophisticated institutional investors on both sides that the Second Circuit said in Covello Bay they could have bargained for the protections of U.S. law if they wanted it. They, you know, they don't get it now, essentially. But in this case, the victims were retail investors with no bargaining power. And the agreement itself, it's in Appendix 1646, Paragraph 5A. It says that the agreement is governed by a purported exemption under the Securities Act. Now, that exemption doesn't apply, and they don't contend it does at this point. But it actually says that the Securities Act applies. So there's no sort of intention by the parties that American law not apply. That would be relevant here. Mr. Weinman, you've given us a number of factual distinctions, but I take it the SEC's preference would be for the First Circuit to line up with the Ninth Circuit and say we really don't think that is the test. So then that gets me to the next question. How many of these cases are there still out there that are going to be governed by these sets of rules given the change that Congress has made in the statute? Very few, I think. This might be one of the last, if not the last one. I'm not aware of any that are sort of percolating the system. There may be one or two, but we are getting to the point where 2010 was a long time ago, and it's not likely to be presented much longer. In the world of courts, 2010 wasn't that long ago. Thank you. Yes, absolutely. So I'd just like to point out on the factual questions, there was a statement of undisputed facts below that Maroney and Yerberg didn't contest virtually at all. There were a couple points that we addressed in our facts section in our brief, but the statement of undisputed facts was very clear on all these points that laid it out. It was essentially admitted by Maroney and Yerberg below. And for purposes of... I wanted to go to the broker point. Their actions really go to the heart of the broker registration requirement, which is intended to provide a level of expertise and training and oversight of brokers. And what it really looks to is whether these people were in the business of effectuating transactions for others. And what the record shows is that they were securities brokers long before they were hired at FireDefense. They were hired for the purpose of raising capital. They were paid percentage commissions on each transaction. They handled the securities. They handled the investor funds. Those are broker actions. With respect to Section 5, the registration violations, it looks to whether necessary steps were taken in the distribution of these securities. Maroney, nobody was more significant in actually distributing these securities from beginning to end. He personally conducted the transactions in addition to all the other steps that we've talked about in terms of setting things up. And I'd also finally mention that Yourberg doesn't contest that his liability for Section 5 is based on his actions with respect to domestic investors at the beginning of the statute of limitations period applied by the district court, his actions in late 2007, early 2008. That's conceded. Maroney did the same, at least with respect to the October 2007 conference call, and the district court found that was relevant, too. So that also independently supports the district court's findings with respect to Section 5. Okay. Unless there are further questions? No. Thank you. Thank you, Mr. Wyman. At this time, if you could mute your device. And Attorney Kaplan, you have a three-minute rebuttal. If you could unmute and reintroduce yourself on the record. Thank you, Stephen Kaplan once more for the appellants. Let me respond to a few of the points. Because I'm talking about the factual basis for finding summary judgment. The court made a distinction and found Mr. Yerberg on the 10b-5 and 17a violations that there was insufficient facts or factual issues which precluded granting summary judgment against them but then turned around and said on the 17a-3 that there was enough facts to find summary judgment against them. There's no way to square that sort of determination. A real difference between 17a-3 and 10b and 17a is the scienter requirement. But the court made no reference anywhere to Mr. Yerberg having the scienter lacking scienter as a basis to deny summary judgment on the 17a-1 and 10b violations but then finding the sufficient facts on the 17a-3. If you look at that specific issue with Mr. Yerberg there's no way to square those findings. The court also, with respect to Mr. Yerberg found he did not violate section 5 as to the overseas sales but did find that he violated section 15 with respect to the overseas sales. We just don't think that factually there was a basis to make those determinations. There were issues of fact throughout this case as to whether or not Mr. Yerberg was anything more than essentially a mailroom guy. He sat in on some meetings but he didn't participate in any meaningful way in any of these sales and I don't think any of the facts support that in the court. I'm sorry counsel but you know, mailroom guys don't sit in on the president of American corporations. They don't get commissions to the extent that Mr. Yerberg did either. Well he got commissions again Judge, you can deem them to be commissions. The company was a start-up technology company which was only developing prototypes for this bio-defense machine which was deemed to protect against bio-hazards. The company never got into the point where it was generating real revenue. So the only revenue that it had during the start-up phase and for which it could pay anybody was out of the proceeds of the sales. I understand, Your Honor, that But the few other employees that they had weren't paid on commission. They got paid out of the same money Your Honor. In commissions which is a percentage versus a set salary though. Absolutely, and I understand the distinction Judge, but again everyone was being paid out of the proceeds of the sales. Some were being paid a set amount, some were being paid a percentage, but it was all coming out of the proceeds. So I think that there are real issues of fact. With respect to the anti-fraud violations against Mr. Marone, I think the court should have looked at whether or not, with respect to Section 10B and 17A and 17A3, whether or not Mr. Marone's conduct raised issues of fact, both as to whether he was a substantial participant in the solicitation of these investors. Because again, while he had a role, was it a significant, substantial role? He never spoke to a single investor. I understand Judge Lynch, I see you're not buying my argument. He didn't directly contact these investors. What he did do is he did not, and there's no allegation that any of the statements he may have put in his talking point were fraudulent. The issue is whether or not he specifically made a disclosure with respect to this commission, which we acknowledge he did not. But whether or not that failure, whether or not that failure was sufficient in and of itself to show that he acted so recklessly that the court could make a finding without a hearing, without an evidence or a hearing, make a finding that he acted so recklessly. Can you seriously contend that if investors understood that for every company that 75% plus would go to fees so that virtually nothing was left over to invest in the business itself, that anybody would ever invest in this? I mean, what could be a more consequential omission than not disclosing those extraordinary fees? Your Honor, I would not even attempt to say that this was not wrongful on the part of the direct participants. Yes, absolutely. This was a material omission and I agree with Your Honor that an investor would unlikely invest if they had known this. The question is not whether or not this was a fraudulent scheme. We can all agree that it was a fraudulent scheme. The question is whether or not the level of involvement, whether Mr. Marrone, who didn't directly communicate with anybody, whether or not he can be found to have acted with scienter with respect to the investments. No, he just prepared the communications which were sent to his underling, which were sent directly to the investors. How is that not substantial participation? Because he was preparing talking points about the company itself. They're both the talking points and the letters to the investors. Judge Thompson? I was just saying he prepared the sales pitch. He may not have delivered the sales pitch but he prepared the sales pitch. Yes, but he didn't control the sales pitch. He had no control over these people who were talking about the company and as to whether or not these salesmen were making disclosures about their fees. That was something which was absolutely not within his control. The issue is whether or not he should have done something affirmative to advise these investors that there was the 75% commission being charged. I think if you look at the cases that we cited, does that rise to the level of recklessness for the purposes that you can find without any type of hearing that he acted with intent to defraud? Again, his role was secondary. Yes, he was in the background. Yes, he was involved in promoting the company but he was not directly communicating with these investors with respect to their investment. He had no control over what was being said to these investors. I think it's not a question of whether or not ultimately Mr. Marone can prevail on this case. It's a question with respect to the specific allegations as to whether or not there's an issue of fact which should have precluded summary judgment. Just as a short point, the SEC Mr. Wyman mentioned the brief period between October and January that there were some Section 5 or Section 15 violations. We don't know from the record below whether there were any sales that were actually made during this period. While there may have been some activity by Mr. Marone in that three-month period, we don't know if it was consequential or if it resulted in the sale of any securities. When we're talking about the sales and the fraud, we're talking about this overseas period and the overseas sales. Unless you have any other questions, I know I've used up my time. No, thank you very much. Thank you very much, Your Honor. It's been a pleasure to appear before you today. Thank you. That concludes argument in this case. Attorney Kaplan and Attorney Wyman, you should disconnect from the hearing at this time.